UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY COUNSELORS, \*
INC. \*
1451 Rockville Pike \*
Suite 250 \*
Rockville, MD  20852, \*
\*
    Plaintiff, \*
\*
v.                               \*     Civil Action No. 1:25-cv-00864
\*
DEPARTMENT OF JUSTICE \*
950 Pennsylvania Avenue, NW \*
Washington, DC  20530, \*
\*
    Defendant. \*
\*
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Plaintiff National Security Counselors, Inc. brings this action against Defendant Department of Justice pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, *as amended* ("FOIA"), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651.

## JURISDICTION

1. This Court has both subject matter jurisdiction over this action and personal jurisdiction over Defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## VENUE

2. Venue is appropriate under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff National Security Counselors, Inc. ("NSC") is a non-profit public interest law firm incorporated in 2010 in the Commonwealth of Virginia as a tax-exempt charitable

organization, which is currently headquartered in the state of Maryland. NSC uses research, litigation, and communications to inform the public about legal issues involving the federal Government and has the ability to disseminate information on a wide scale. As part of its research, NSC uses government records made available to it under FOIA as well as Government records that agencies have made available to the general public.

4. Defendant Department of Justice ("DOJ") is an agency within the meaning of 5 U.S.C. § 552(e) and is in possession and/or control of the records requested by NSC which are the subject of this action. DOJ further is responsible for making records available to the public as required by law.

5. The Office of Legal Counsel ("OLC") is a DOJ component.

## BACKGROUND

### PART I: STATUTORY FOIA FRAMEWORK

6. Section (a)(2) of FOIA is known as the "reading room" provision. It imposes a number of independent, affirmative obligations on all Executive Branch agencies, including the obligation to "make available for public inspection and copying" certain designated categories of records. Those categories include, *inter alia*:

> (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases; [and]
>
> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[.]

7. Section (a)(2)(E) of FOIA imposes on agencies the additional requirement to make publicly available:

> current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph [including the reading room provision] to be made available or published.

8.      Under section (a)(2) of FOIA, agencies must publish records which fall within the enumerated categories even in the absence of any request from a member of the public.

9.      Section (a)(3) of FOIA governs the well-understood system of agencies providing records to individual requesters.

### *PART II: LEGAL STATUS OF OLC OPINIONS IN GENERAL*

10.     The Judiciary Act of 1789 established the position of the Attorney General of the United States and charged the Attorney General with providing opinions on questions of law to the President and to the heads of Executive Branch entities:

> And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; whose duty it shall be . . . to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.

28 U.S.C. §§ 511-513.

11.     In 1933, the Attorney General delegated his opinion-writing function to an Assistant Solicitor General. In 1950, the opinion-writing function was transferred to a new DOJ office called the Executive Adjudications Division. In 1953, that office was renamed OLC.

12.     OLC originally would prepare opinions for the Attorney General's signature. Since the early 1960s, the Assistant Attorney General for OLC or one of his deputies has signed virtually all of DOJ's legal opinions under delegated authority from the Attorney General.

13.     Today, OLC's formal written opinions continue to establish the binding law of the Executive Branch. The DOJ's website confirms that OLC's core function is to provide "authoritative legal advice to the President and all the Executive Branch agencies."

14.     OLC has periodically issued memoranda discussing the office's unique role within the Executive Branch. On 16 July 2010, then-head of OLC, Acting Assistant Attorney

3

General David Barron, issued a memorandum to OLC attorneys describing the office's "Best Practices." The memo states that OLC's "core function" is to "provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government." According to the memo, OLC's opinions "may effectively be the final word on controlling law," in part because OLC "is frequently asked to opine on issues of first impression that are unlikely to be resolved by the courts." The memo described OLC's "system of precedent" as one in which OLC's prior opinions are accorded "great weight."

15. According to Barron's memo, OLC generally does not provide "abstract legal opinions" or "general survey[s]" of the law and it does not offer "unnecessary advice, such as where it appears that policymakers are likely to move in a different direction."

16. According to Barron's memo, before accepting a request for an opinion, OLC typically requires the soliciting agency to submit a "detailed memorandum setting forth the agency's own analysis of the question." If the request concerns an interagency dispute, OLC "will ask each side for a memorandum" and allow each side to "reply" to the other. Even when there is no manifest dispute between agencies, OLC "will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented."

17. Once OLC finalizes a formal written opinion, it prints the opinion on bond paper for signature along with a completed opinion control sheet signed by the lawyers responsible for the opinion. The OLC adds all unclassified opinions to an electronic database and to its "unclassified Day Books."

18. Barron's memo followed a similar memo issued on 16 May 2005 by then-head of OLC, Principal Deputy Assistant Attorney General Steven Bradbury. Like Barron's memo,

Bradbury's memo stated that "OLC opinions are controlling on questions of law within the Executive Branch"; that the opinions "should be focused and concrete"; that they are "more likely to be necessary" when resolving interagency disputes; that the office's past opinions are "given great weight"; and that drafts undergo "rigorous review."

19. Numerous former OLC lawyers have confirmed that OLC's formal written opinions constitute the controlling legal views of the Executive Branch. One former head of OLC, now-Judge Randolph Moss, has said in his scholarship that the OLC's "formal, written opinions, constitute[] the legal position of the executive branch," and that "although the heads of departments are not generally required to seek legal guidance from the Department of Justice, when they do so, it is understood that the opinion provided will become the controlling view of the executive branch." Moss also observed that "executive branch agencies have treated Attorney General (and later the Office of Legal Counsel) opinions as conclusive and binding since at least the time of Attorney General William Wirt[, who served from 1817 to 1829]."

20. As noted above, OLC has published only a subset of its formal written opinions; however, the opinions that have been released underscore that they are meant to be authoritative and binding on executive agencies. The opening paragraphs of formal OLC opinions usually describe the legal questions presented in much the same way as judicial opinions would. Their final paragraphs generally announce their resolution of the question presented and their legal conclusions in much the same manner as the final paragraphs of many judicial opinions. The legal analysis within each opinion is grounded in OLC's own precedents. And the opinions state their legal conclusions in mandatory language. They do not equivocate or confine themselves to presenting the advantages and disadvantages of a particular legal interpretation. Instead, they conclusively resolve concrete legal questions about the Executive Branch's legal obligations.

21.     OLC's formal written opinions also reflect the law of the Executive Branch insofar as an opinion concluding that certain conduct is lawful effectively immunizes that conduct from criminal liability. DOJ has adopted a policy of refusing to investigate or prosecute individuals who relied on OLC opinions to justify their conduct, and former head of OLC Jack Goldsmith has called the OLC opinions authorizing the Central Intelligence Agency's "enhanced interrogation techniques" a "golden shield" from prosecution.

22.     In short, OLC itself considers its formal written opinions to be binding upon all agencies, and the rigorous process it has implemented for the initiation, drafting, review, preservation, and precedential consideration of its formal written opinions reflects that view. As Karl Thompson, the acting head of OLC in 2014, said at the time: OLC's formal written opinions are "authoritative" and "binding by custom and practice in the executive branch. It's the official view of the office. People are supposed to and do follow it."

## PART III: SECRET LAW LITIGATION IN GENERAL

23.     Under controlling precedent, "an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealing with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'"

24.     Under this precedent, any agency is required to disclose "orders and interpretations which it actually applies to cases before it," in order to prevent the development of "secret law."

25.     In the context of legal memoranda, this means that when the Government "is attempting to develop a body of coherent, consistent interpretations of federal . . . laws nationwide," such memoranda are "considered statements of the agency's legal position."

26. There have been several FOIA cases where plaintiffs have attempted to use this controlling precedent to compel OLC to release specific opinions.

27. The highlights of this case law can be illustrated as follows, using quotations from *ACLU v. NSA*, 925 F.3d 576 (2d Cir. 2019), which summed up the existing case law.

28. "[A] document embodies an agency's 'working law' when the document binds agency officials or members of the public. In other words, working law announces what an agency's law *is*, not what the law *might be*. Because such a document has operative effect—*i.e.*, binding rather than persuasive power—it is inherently post-decisional."

29. "[W]hen an agency circulated and consulted certain documents as a source of binding authority, these documents were a post-decisional 'functioning body of secret law.'"

30. "[M]emoranda [which] had been distributed to ensure 'the promotion of uniformity throughout the country on significant questions of . . . law . . . functioned as precedent rather than mere guidance [and] constituted 'working law' rather than pre-decisional advice."

31. "Occasionally, documents drafted as pre-decisional material will ultimately be recycled and reissued as an agency's 'working law.'"

32. "[An] OLC memorandum [which was publicly invoked as authority supporting an action] was no longer simply advice to a policy-maker, [because] the Government afforded the memorandum binding force within the Executive Branch as its 'effective law and policy.'"

33. [An] OLC memorandum [which was publicly invoked] not just to defend [DOJ's] own policy, but as *embodying* this new policy . . . 'demonstrate[d] that [DOJ] regarded the Memorandum as the exclusive statement of . . . its new policy.'"

34. "[When] senior agency officials related to OLC's legal advice as binding authority, *i.e.*, as 'working law[,]' . . . [the agency] adopted the OLC memorandum."

35.     "[A] document is only 'working law' when it operates as functionally *binding* authority on agency decision-makers."

36.     "Mere agreement with a document's reasoning and conclusion is insufficient to transform advice into law. Instead the document must be *treated* as binding by the agency . . . or explicitly relied upon in a formal decision."

## PART IV: SECRET LAW READING ROOM LITIGATION

37.     While there have been many FOIA lawsuits over the releasability of individual OLC opinions, OLC's refusal to proactively disclose them under FOIA's "reading room" provision was not the subject of litigation until 2013.

38.     As the case law on this question developed, a few key points emerged.

39.     First, FOIA and not the Administrative Procedure Act is the proper avenue for enforcing the "reading room" provision, and the relief available under FOIA encompasses a broad, forward-looking injunction that is not limited to the production of individual documents.

40.     There is a circuit split on the question of whether a court can order an agency which has been found to have violated the "reading room" provision to publish documents to the general public as opposed to disclosing such records to the plaintiff alone. The prevailing interpretation in this Circuit is that a court cannot do so, although NSC maintains that that interpretation is incorrect and should be changed.

41.     A complaint to enforce the "reading room" provision against OLC must generally identify a specific subset of OLC's formal, written opinions which are being unlawfully withheld. Such a complaint must generally identify an ascertainable set of OLC opinions which plausibly constitute the law or policy of the agency to which the opinion is addressed.

42. Such a plaintiff is not required to anticipate potential exemptions; it is only required to plead more than that OLC's formal written opinions are controlling to make out a plausible claim that the opinions are the working law of an agency subject to disclosure under the "reading room" provision.

43. Such a plaintiff is not required to have requested a specific document in order to file a complaint arguing that it—and others like it—are subject to disclosure under the "reading room" provision.

44. Last year, Judge Cobb found that all formal OLC opinions which resolve interagency disputes are subject to disclosure under the "reading room" provision and are not categorically protected by FOIA Exemption (b)(5). This decision is currently under appeal.

### PART V: EXECUTIVE ORDER 14,215 CHANGES THE LEGAL LANDSCAPE

45. The primary common thread between all of the cases where a formal OLC opinion was found not to trigger the "working law" provision is a judicial finding that the opinion in question was not legally binding on the agency. As a result, such an opinion was found to be predecisional and, on occasion, protected confidential legal advice.

46. On 18 February 2025, President Trump issued Executive Order 14,215, entitled *Ensuring Accountability for All Agencies*.

47. While this Executive Order is primarily focused on independent agencies, Section 7 has no such limitations. That Section—entitled "Rules of Conduct Guiding Federal Employees' Interpretation of the Law"—establishes a new policy for all agencies in the Executive Branch.

48. Section 7 states:

> The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch.

9

> The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General.

49. By formally issuing Executive Order 14,215 with Section 7 in this form, President Trump has officially confirmed that formal OLC written opinions—which are issued under authority delegated from the Attorney General—constitute functionally binding authority on agency decisionmakers.

50. Accordingly, all formal OLC written opinions are now also subject to disclosure under the "reading room" provision and are not categorically protected by FOIA Exemption (b)(5).

51. In light of this major change in the legal landscape, NSC is now relitigating portions of four separate cases in which OLC originally refused to disclose formal written opinions based on the contention that the opinions were exempt from disclosure by FOIA Exemption (b)(5).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (CONSTRUCTIVE DENIAL – FY25-166)

52. NSC repeats and realleges the allegations contained in all paragraphs set forth above.

53. On 19 February 2025, NSC submitted to OLC via the portal at https://www.foia.gov a FOIA request for eighteen formal OLC written opinions on the topics of

FOIA, the Privacy Act, the Federal Records Act, the Presidential Records Act, agency records retention policies, and polygraphs.

54. Fifteen of these OLC opinions were the partial subject of the case *National Security Counselors v. CIA*, No. 11-445 (D.D.C.), and the remaining three OLC opinions were the partial subject of the case *Sack v. CIA*, No. 12-244 (D.D.C.).

55. On 5 March 2025, OLC acknowledged this request and assigned it Req. No. FY25-166.

56. As of this writing, OLC has not made a substantive determination within twenty business days regarding NSC's request.

57. NSC has a legal right under FOIA to have its request fully processed, and there is no legal basis for the denial by OLC of said right.

## SECOND CAUSE OF ACTION

## (CONSTRUCTIVE DENIAL – FY25-167)

58. NSC repeats and realleges the allegations contained in all paragraphs set forth above.

59. On 19 February 2025, NSC submitted to OLC via the portal at https://www.foia.gov a FOIA request for a "fully unredacted list of all official OLC opinions issued since 1998."

60. NSC elaborated that "[t]he lists released in response to FOIA Req. FY19-001 will suffice for those years, and comparable lists will suffice for years since those records were released."

61. The lists released in response to FOIA Req. FY19-001 were the partial subject of the case *Project on Government Oversight, Inc. v. DOJ OLC*, No. 20-1415 (D.D.C.).

62. On 5 March 2025, OLC acknowledged this request and assigned it Req. No. FY25-167.

63. As of this writing, OLC has not made a substantive determination within twenty business days regarding NSC's request.

64. NSC has a legal right under FOIA to have its request fully processed, and there is no legal basis for the denial by OLC of said right.

### THIRD CAUSE OF ACTION

### (CONSTRUCTIVE REFUSAL TO PROACTIVELY DISCLOSE)

65. NSC repeats and realleges the allegations contained in all paragraphs set forth above.

66. On 19 February 2025, the Executive Director of NSC wrote to Acting Assistant Attorney General Henry Whitaker requesting that OLC "immediately comply with its obligations under 5 U.S.C. § 552(a)(2) to make available for public inspection and copying on an ongoing basis all unpublished formal written OLC opinions and a general index of all such opinions OLC has issued." NSC's letter made it clear it was not a request for records under 5 U.S.C. § 552(a)(3).

67. NSC clarified that it was voluntarily limiting the scope of its proactive disclosure request to only OLC's formal written opinions because they undeniably function as binding law on the Executive Branch.

68. NSC additionally indicated that it explicitly adopted all of the arguments made by Campaign for Accountability in its similar letter dated 22 March 2015, which was the subject of the case *Campaign for Accountability v. DOJ*, No. 16-1068 (D.D.C.).

69. NSC additionally indicates now that, with the filing of this litigation, it also voluntarily excludes from this proactive disclosure request any formal OLC written opinions issued to the Executive Office of the President, so as to avoid unnecessary controversy.

70. FOIA's "reading room" provision requires all agencies, including OLC, to make available for public inspection and copying final opinions made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency and not published in the Federal Register.

71. OLC issues opinions which fall within the categories of records that the "reading room" provision requires be made available for public inspection and copying, including formal written opinions issued to Executive Branch agencies and officials.

72. OLC has refused for years to make available for public inspection and copying all final written opinions made in the adjudication of cases and statements of policy and interpretations which have been adopted by an agency. This has led to the creation of a body of secret law within the Executive Branch—the precise danger Congress sought to avoid through the enactment of the "reading room" provision.

73. The "reading room" provision further imposes on agencies the additional requirement to make publicly available current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after 4 July 1967, and required by FOIA to be made available or published.

74. The refusal of OLC to comply with its statutory obligations to provide NSC and the public at large, on an ongoing basis, OLC opinions—and an index of such opinions—which fall within the scope of the "reading room" provision has harmed, and continues to harm, NSC in carrying out its programmatic activities related to informing the public about legal issues

involving the federal Government. NSC has suffered an informational harm by being deprived of information the law requires OLC to affirmatively make available to the public.

75. As of this writing, OLC has not made a substantive determination within twenty business days regarding NSC's request.

76. NSC is therefore entitled in the form of a declaratory judgment that OLC has failed to comply with the disclosure and indexing obligations of 5 U.S.C. § 552(a)(2).

77. NSC is also entitled to an injunction directing OLC to redress its failure to comply with the disclosure and indexing obligations of 5 U.S.C. § 552(a)(2) by disclosing to NSC and the general public, without a specific request: (1) all past and future formal written opinions issued to Executive Branch agencies or officials outside the Executive Office of the President and not published in the Federal Register; and (2) indexes of all past and future formal written opinions issued to Executive Branch agencies or officials outside the Executive Office of the President.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff National Security Counselors, Inc. prays that this Court:

(1) Order the Office of Legal Counsel to release all specifically requested records;

(2) Declare that OLC has failed to comply with the disclosure obligations of 5 U.S.C. § 552(a)(2) by refusing to make available for public inspection and copying all formal written opinions issued to Executive Branch agencies or officials outside the Executive Office of the President (and indexes thereof);

(3) Order OLC to disclose to NSC and the general public all formal written opinions issued to Executive Branch agencies or officials outside the Executive Office of the President (and indexes thereof).

(4) Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

(5) Award reasonable costs and attorneys' fees as provided in 5 U.S.C. § 552(a)(4)(E), 28 U.S.C. § 2412(d), or any other applicable law;

(6) Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(7) Grant such other relief as the Court may deem just and proper.

Date:   March 24, 2025

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD  20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*